Good morning, Your Honors. May it please the Court, my name is Alan Akhbegian, and I'm appearing on behalf of the petitioners. There's a lot to talk about in this case. We essentially have three separate applications, but I'm going to try to reserve a couple of minutes for rebuttal. Initially, we have two petitions that were consolidated. If Your Honors don't mind, I'm going to try to address the first petition first, not to confuse the matters too much, and then move on and address the second petition. Preliminarily, as the Board found that Ms. Brodichnia did file her asylum application in a timely fashion, I'm not going to discuss the one-year deadline because that issue is moot at this point. So her asylum application is deemed to be timely filed. With respect to the standard of review, again, I wanted to point out that this case is not governed by the Real ID Act, as the petitioners filed their applications prior to May 11, 2005. And the standard review would be the substantial evidence test, and the BIA and IJ's decision must be supported by reasonable, substantial, and probative evidence on the record considered as a whole. As I'm going to discuss briefly, and I'm going to try not to repeat, obviously, what's already been discussed at length in the briefs, nothing in the record compels a denial of these cases or supports a denial of these cases. This case contained hundreds of pages of documentary evidence, which the Respondent and the Immigration Judge and Board conveniently chose to completely ignore and just resort to selective reading of facts that supported their decision. Initially, as discussed in our brief, the BIA's outright silence on the IJ's adverse credibility finding constitutes a presumption that it found the petitioner to be credible. In fact, if we look at the Board's decision, the only mention to the term credibility is the Board saying, assuming respondents testified credibly. And then it goes on to analyze, basically, whether it was past persecution, whether it was by the government or agents of the government. And there's several cases here that are exactly on point. I'm going to talk about the Cordova case at length because it's just strikingly similar. It's almost the identical case that we have before this Court. And the Court there, this Court there, held that where the IJ makes an adverse credibility finding which the BIA does not address, and the BIA is silent on the issue, we may presume that the BIA found the petitioner to be credible. Kagan. Can you go to the merits of the application, please? Very well. So I'm not going to just waste more time on that. So as far as the merits of the application, again, assuming that the petitioners testified credibly, that was twofold. Initially, the Board argues that the past persecution did not, the past incidents did not rise to the level of persecution. Now, again, it's interesting to see, to note that they completely tried to undermine. From my mind, it would be most useful to concentrate on the unable and the willing. Okay. Then I'll just move on to there. The asserted persecution in both instances was not by the government. And the government police did show up at times when asked to show up. So what's the basis for the unable and the willing? Sure. And I would address that, Your Honors. Again, the record is very, very voluminous, but if we look at the record, it's true that the beatings, most of the beatings and the threats and incidents were at the hands of the skinheads. However, both Mr. Zerbin and Ms. Bordichnia were detained by the police, specifically because of their involvement with this student organization. Ms. Bordichnia was not beaten, but she was threatened. She was demanded that she basically turns over names of the party members and leaders and what have you. Mr. Zerbin was himself beaten by the police. Now, the respondent argues that basically Mr. Zerbin got what he deserved because he was being a loudmouth. And I would just submit to the court, respect with that is just completely ridiculous. They were each detained one time and Zerbin was beaten and the detention was brief. Is there anything that would indicate that that's sufficient to demonstrate government involvement? In and of itself, no, Your Honors, but basically we do have a detention by the police and then I will address the involvement by the skinheads. Now, again, the Kortova case is exactly, exactly on point here. This court in Kortova where the petitioner there had complained on numerous occasions, had called the police on numerous occasions for help and the police had failed to show up. I hear they didn't fail to show up. I'm sorry? I hear they didn't fail to show up. They showed up basically after the fact. They showed up and everything was fine while they were there and then when they left they got beaten. But it seemed like while they were there they were keeping the skinheads in check. Or at least there was evidence, substantial evidence to that effect in the record. Sure. Well, Your Honors, both petitioners specifically testified that they called the police a day in advance. The police was well aware that these incidents are prevalent during these specific days, Hitler's birthday and some other days that the response were trying to basically be there and protect the mosques and what have you. The police specifically, and it was their argument that they intentionally showed up late. They waited until the events had happened and they showed up after the fact. During one of the meetings, the petitioner... I thought in that instance they showed up when they were called the first time. No, that's what the judge says, Your Honor, and that's what the BIA says. But if we read the actual testimony, the petitioner specifically, and I did see that, Judge. You're absolutely correct, Your Honor. Looking at the testimony, the petitioners, both of them testified that we called the police beforehand. We told them we're going to be at this place at this time. We have information. We believe that there is going to be an attack by the skinheads. Please show up at this time. Yet the police never showed up until after the events, after these people were beaten, after the mosques. This is the first incident. They didn't show up within 20 minutes? They showed up within 20 minutes of the incident, correct. You're saying they were called in advance. They were called in advance the day before and they were told exactly what time they were going to be there and the police just showed up later. And what's even more telling is the fact that the police's complete lack of care about the incidents. They show up. They're given some tapes, in fact, some video footage that Ms. Borodechnia had shot. They take it with them. When the petitioners inquire as to, Hey, what happened? Did you guys ever investigate this? Their response is, No, we didn't. In fact, we even lost the tapes that you gave us. It's just the complete, utter lack of care and lack of basically concern about the safety of the minorities or whoever tries to protect them. And again, if I may, I think this point is very, very telling because in Kortova, this court held that when you consider the fact, along with corroborating documentary evidence that Russian authorities have been extremely slow to respond to incidents of anti-Semitic vandalism, indeed compelled a finding that the petitioners suffered past persecution by a group which the government was unwilling or unable to control. Again, in this case, Your Honor, I know that the BIA obviously completely fails to mention any of this information, any of this evidence. But the Department of State report clearly, clearly talks about the police's abuse of the minorities, talks about how, in fact, a lot of the officers are sympathetic to the cause of these extremists and therefore the movement really is not controlled. If I may, Your Honor, I don't want to basically waste eight hours talking about all the examples, but if I may just have one second, in the administrative record on page 449, the Department of State report provides that the government is itself involved with the persecution of minorities or at the very least unwilling or unable to control the skinheads. It states that the police reportedly beat, harassed, and demanded bribes from persons with dark skin. Police rarely made arrests in cases involving skinheads and other racist and extremist groups, even though such incidents were reported by human rights organizations. The state administration and law enforcement agencies did not do enough to address the issue because of lack of resources and, in some cases, sympathy with nationalistic causes among working-level staff. The record contains ample evidence that the Russian government just simply, if there's no direct involvement per se, they simply do not care to protect the minorities. In fact, they indirectly use... But your clients are not the minorities, I guess is what the IJ indicated. Correct, Your Honor. They were ethnic Russians. Correct, and to that point... And they weren't so high profile as to attract attention as human rights activists. That's correct, Your Honor, but what is a human rights activist? Someone who's the head of the Amnesty International. A human rights activist is someone who cares about others, who cares about minorities and tries to fight for their rights. Sure, they were part of a very small organization, but so what? There's no requirement that someone be a member of the Amnesty International for you to be protected by our laws. The record specifically, again, just going to your point, Your Honor, the record specifically says that skinheads have become significantly well-organized, targeting human rights activists, lawyers, and academics who oppose them. Again, Your Honor, you're absolutely correct. These people were not very high-profile individuals, but they were basically people who cared about their friends, people around them, minorities around them, and they did not agree with the way that they were being treated. They tried to protect them. Ms. Borodichnian herself is a journalist. She tried to basically bring this to the attention of the authorities, and she was persecuted because of that. She was beaten. She was harassed. She was threatened. And the government failed to do anything to protect her. Okay, your time is up. We'll give you about a minute in rebuttal. Thank you very much. If I may, I'm just going to use my time for the rebuttal. I think this is also an important point I want to mention. In the motion to reopen that was filed, when the board found that the asylum application was timely filed, they basically immediately jumped and said, well, despite that fact, the judge already had determined that the petitioner did not possess a well-founded fear of persecution. However, your Honor, I would ask that you actually, and I'm sure you have, look at the actual record as opposed to what the board holds, because Judge Giottina, the immigration judge, never, ever evaluated the claim based on the well-founded fear, which is a one in ten chance of future persecution for asylum. You know, when I looked into that, there was some language where the I.J. said, even if she were eligible for asylum under Section 208A of the Act, she does not have a well-founded fear of persecution. So it did appear that the I.J. addressed that. Correct. Is that not? Correct. You're right, your Honor. But I don't want to waste time looking for the section, but if you follow reading that, he does say that, your Honor, but then he goes ahead and uses the more likely than not standard, which is the wrong standard to use for the credible fear. It's a much more onerous standard, and that's the standard that he used to analyze it. Does that matter, given that the BIA essentially did it all over again anyway? I'm sorry? Didn't the BIA essentially do it all over again anyway? Well, the BIA does not have a right to reassess the credibility and the respondent's eligibility for asylum. I would imagine that they should have remanded it to the judge for basically a further analysis of the asylum claim based on their new finding that the asylum application was timely filed. Thank you. Yes, sir? Good morning, your Honors. And may it please the Court, Fred Sheffield on behalf of the Attorney General's Office We're asking that you deny these consolidated petitions because the record evidence amply supports the determination by the Board of Immigration Appeals that neither Mr. Zerbin nor Ms. Bordigna qualify for asylum. What about the last point that was made, i.e. that the IJ never reached the judge's side at this point? Well, I don't know that I necessarily agree with Petitioner's characterization of the immigration judge's decision. What we're referring to at this point is on page 87 of the 2007 case record or 2024 of the 2009 record. And it's the last paragraph before Convention Against Torture. And the immigration judge says, Accordingly, the Court finds that the respondent has not met her burden of proving that she would be more likely than not be persecuted if she returned to Russia. And even if she were eligible for asylum under Section 208 of the Act, she does not have a well-founded fear of persecution. So what the immigration judge seems to be doing, and if we turn to the previous page, that's where the immigration judge is assessing the future fear of persecution. Now, the immigration judge's decision about a future fear of persecution is based on what I can see is two factors. One, there's some doubt about her subjective fear, which is an element of future persecution, because of the fact that she didn't appear to leave Russia with any particular fear. She stated repeatedly in the record that she had no fear of Russian authorities at the time that she was released, just days before she left the country. As your honors will no doubt remember, both of the petitioners left the country on J-exchange visas that they had arranged months before they actually started preparing this student organization, and that it was within a course of two months prior to their... But there is no adverse credibility. No, no, there is no adverse credibility, but nevertheless, subjective fear is an element of well-founded fear. So just to get back to talking about what the immigration judge did here, he's assessing subjective fear, and then he's also assessing the country conditions evidence with respect to human rights violators. Human rights violators, not the country conditions evidence that point to the fact, and there certainly is a lot of this in the record, that point to the fact that skinheads are proliferating and are persecuting minorities. And as a petitioner points out, that's the Krotovo case. There's another case that's similar that arises in Ukraine, Korobolina. I think that's cited in the briefs as well. So I think if this were a case in which we were talking about minority activists, or even minorities in Russia, then we might be talking about a different matter. But we're talking about ethnic Russians, members of the ethnic and religious minorities, and there's simply very, very, very little in this record to support the notion that people have. Well, just to talk a little about the last point made by your opponent, if in fact we thought that the IJ didn't really decide the merits of the asylum claim, then what? Would we have to remand or would the BIA just do it on the record? The BIA did. Right. I mean, the BIA reviews the immigration judge's decision de novo. I really don't think that there's any basis for finding. Well, they're not supposed to review de novo. They're supposed to review for clear factual error as to the facts, right? So the real question is whether there were facts here. Well, the BIA reviews decisions as to whether an applicant met their burden of proof de novo. So that's what, and as to the well-founded fear. In other words, what you would say is that there was really no, as to the factual determinations, he made the factual determinations, but if he was making it on a more likely than not basis rather than on a 10 percent likelihood basis, that could matter? Well, I think, I mean, it's just immigration judges routinely utilize alternative holdings. But here the alternative holding with regard to the asylum was only at the tail end of a long discussion that was all about withholding. Right. And the assertion that's being made is he, ordinarily it's done in the other order. Right. Because if you don't get asylum, you don't get withholding, but the opposite is not true. Correct. And that's the problem. I don't think it's a problem simply because we are not seeing an immigration judge who makes what would have been an error by saying because they don't qualify for withholding, they automatically don't qualify for asylum. I would concede that if that's what the immigration judge did here, that would be an error. But then you said the BIA can nonetheless look at the same underlying factual determinations and decide whether they meet the asylum standard. Well, the BIA would review an immigration judge's decision de novo. Yes, I think the BIA could look at the facts so long as there were no factual, so long as there were no issues with the facts that the petitioner raised. In this case, the petitioner never raised any issues with the immigration judge's factual findings. The IJ says that he's considering her eligibility for asylum and then says under that standard she doesn't have a well-founded fear of persecution. The BIA then, as I understand it, agrees with the immigration judge's finding. And so what are we looking at there? Are we looking at whether that finding was supported by substantial evidence or something else? You're looking at whether the determination by the agency as a whole, so the immigration judge's determination that she doesn't qualify based on a well-founded fear, which the board then reviewed de novo and agreed with. You're looking at the evidence as a whole, and what you have to decide is whether this evidentiary record compels a conclusion that this applicant has a well-founded fear. In terms of the procedural argument, I really don't think there's much of an argument that either the immigration judge or the board erred in assessing this procedurally. There's nothing that precludes an immigration judge from assessing, from making an alternative determination as to well-founded fear, even if he or she is going to find that the application is denied because it's untimely. And that's what we had here. I think the fact that this is even at issue is simply because the immigration judge decided to put this sentence at the end of his decision as opposed to the beginning. But there's nothing in this sentence that suggests an immigration judge who does asylum cases all day long and who knows perfectly well what the well-founded fear of persecution standard means. There's nothing that suggests that the immigration judge didn't mean what he said, which is I find that she hasn't, based on the factors that I've outlined, which are relevant in a withholding context. Based on those factors, I find that she does not have a well-founded fear of persecution. So I think if we're going to start going down the road that Petitioner wants us to go down, which is to suggest that because the immigration judge had just been assessing the more likely than not standard, we have to be inferring that for whatever reason the immigration judge didn't mean what he said, which is I find that she doesn't qualify under the lesser withholding. Can I ask you about the enabling and blaming issue? Sure. First of all, there was a representation made, but a factual error. Is that correct? Is it correct that there was a telephone call to the police in advance of the first demonstration, but they didn't show up until they were called a second time after? Right. What Petitioners testified to, and I think both of them testified to this, was that they placed calls to the police in advance of the April 20th incident. I think April 20th was a day when they went out and had suspicions that skinheads were going to attack certain mosques. And it was during they made phone calls to the police, and the police responded by saying, from what I read the testimony to be, the police basically said, okay, we've got it. We're on top of it. They said, or in other words, we know how to patrol. You don't have to tell us where to patrol. The police didn't say that they would show up. On the other hand, this wasn't a public meeting, which happened at other points in the testimony where the police did show up. This was simply the Petitioners standing out in front of a mosque for several hours before the skinheads approached. So I'm not sure what would have been reasonable for the police to do,  The short answer to whether there was a prior phone call is yes. Yes, there was a prior phone call, and the police responded. The police did not refuse in their response. I think that's the important thing. They didn't come. They came ten minutes after they were summoned. This is the second time. No, this was... I'm confused. I know. My understanding is that the representation that was made was that although the IJ and BIA portrayed the situation as if they were called only during the incident and they came right after they were called. In fact, they were notified in advance of the incident but didn't come until they were called a second time when the problem arose. Well, I don't know that either the immigration judge or the board misrepresented the fact that the police were never at any point called. I think what both the IJ and... But they were called. But they were called during the event. They were called both the day before and advised... But they were called the day before. And then they were also summoned when the altercation was happening and came ten minutes afterwards. Are you saying there wasn't an event? There was just like roving bands of skinheads that were attacking mosques? That's right. April 20th is Hitler's birthday and the petitioners alleged that they went out and positioned themselves at places where they believed. It didn't sound like they had any particular knowledge for certain that this was going to happen, but they believed that skinheads might target these places. Correctly, as a children. Sorry? Correctly they believed. Yeah, they correctly believed that. And they went out and positioned themselves there for what sounded like several hours. And it was when the skinheads finally approached and appeared that a fight ensued. The police were called. The police came ten minutes later. For the later meetings, which were actually public demonstrations, those were instances where the police were called. Police protection was requested and police protection was granted. I think all of that provides more than substantial evidence that the board and the immigration judge could have used in finding that there was no past persecution in this case. Subject to the court's further questions, we would rest on our briefs, Your Honor. Well, since you're over your time, that's a good thing. Thank you very much. Well, since you specifically gave up your rebuttal time, you don't have any rebuttal time. Thank you very much. I completely gave it up. Sorry, what? I completely gave it up. I don't even have 30 seconds. Go ahead. Just real quickly, honestly, because this is very important and it just addresses your questions. Page 20 of the IJ's decision, 87 of the record. In closing, when the judge is basically running a decision as to withholding, the judge says, according to the court finds that the respondent has not met her burden of proving that she would more likely than not be persecuted if she returns to Russia. And even if she were eligible for asylum, she does not have a well-founded fear. Clearly, the judge can't just mix these two standards together, these two beliefs together, Yeah, but the problem is that the BIA did a separate analysis. Anyway, thank you very much. Thank you, Your Honor. Thank you for your arguments. The case of Zirvin v. Holder is submitted.
judges: Berzon, Ikuta, Nguyen